In re the MARRIAGE OF Olen Dale ADAMSON and Barbara Jean Adamson.

Olen Dale ADAMSON, Respondent,

v.

Barbara Jean ADAMSON, Appellant.

No. 13518.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 31, 1984.

John S. Pratt, Springfield, for appellant.

James E. Baldwin, Donnelly, Baldwin & Wilhite, Lebanon, for respondent.

CROW, Judge.

Barbara Jean Adamson ("Barbara") appeals from a judgment dissolving her marriage to Olen Dale Adamson ("Dale"). As explained herein, we find the judgment unappealable. Consequently, the appeal is dismissed.

Barbara and Dale were married February 24, 1954; they separated March 3, 1981. Dale filed a petition to dissolve the marriage on April 21, 1981. Barbara, in a "cross-petition," sought maintenance, attor-

ney fees, and costs, together with "an equitable division of the marital property of the parties and an equitable apportionment of the marital debts."

Trial began March 4, 1983, some 22 months after the action was initiated. Dale testified he had agreed with Barbara that all of the marital real estate would be sold at public auction, together with certain marital personal property. Dale explained that the proceeds from the auction "would be deposited in an escrow account from which the liabilities owed from the farming operation, to which [Barbara] did not object, would be paid." Dale expected there would be some debts to which Barbara would object, and, as to those, the trial court would ultimately conduct a hearing to determine whether such debts "were legitimate claims against the proceeds from the sale of the farm and the personal property."

Certain personal property, itemized in writing and in Dale's testimony, was to be exempt from the auction. Evidently, the parties expected the trial court, after the auction, to resolve any disputes regarding those items, and to adjudicate "all remaining issues."

Barbara testified that "this proposed partial settlement of the matter by way of sale at public auction" was fair to her and Dale, and was agreeable to her. She asked the trial court "to approve this verbal separation agreement" and to order both parties to perform the terms thereof.

At the conclusion of this relatively brief hearing, the trial court took the cause under advisement "pending the filing of a written separation agreement." The court announced that after the agreement was filed, the court would "make the appropriate orders."

On April 7, 1983, a written agreement, bearing the parties' signatures, was filed in the trial court. It provided that, except for certain personal property, all property owned by the parties, "whether real, personal or mixed shall be sold in accordance with the terms of this agreement, and after payment of the joint debts of the parties,

the proceeds of said sale shall be equitably divided between the parties pursuant to the court hearing as hereinafter provided." The agreement named the auctioneer, directing the court to appoint him a "special receiver" to conduct the sale and handle the proceeds.

The agreement confirmed that after the auction, a hearing would be held by the court "for the purpose of determining how and in what manner the proceeds from the aforementioned sale shall be disbursed between the parties, determining the legitimacy of alleged joint obligations incurred as a result of the farming operation, determining the ownership of certain items of contested personal property," and ruling upon Barbara's claims for maintenance, attorney fees and all other disputes.

Included in the agreement was a recitation that the parties believed it was conscionable, and a request by them that the court approve it. If approved, the agreement was to "be made a part of any court decree, by reference."

The agreement also contained a clause providing that each party "may bid on any item at said auction, the same as an independent or third party."

Under date of April 29, 1983, the trial court signed an order finding that the written agreement "is not unconscionable and should be approved." The order appointed the agreed-upon "special receiver" and provided for certain steps necessary in conducting the auction. The agreement authorized the receiver to accept bids by Barbara and Dale, and to permit them "to apply their reasonably anticipated revenues from the disposition of property toward the purchase price in lieu of cash."

As real estate was to be sold, the order empowered the receiver "to prescribe reasonable terms for completing the closing of the sale of any such property, to include authorization for proof of title or other conventional procedures reasonably utilized in commercial transactions to be provided as Sellers' expense." Expenses of sale, after approval by the court, were to be paid

by the receiver from the sale proceeds. The receiver was "further authorized to pay upon specific approval by the Court, any and all encumbrances on property sold and delinquent taxes thereon necessary to permit transfer or conveyance of property sold free of encumbrance."

The receiver conducted the sale on May 14 and 15, 1983. At a hearing on July 27, 1983, the trial court learned what had occurred.

A "600 acre farm," the largest single item of marital property, was "purchased" by Dale for $156,000, evidently the highest bid. Dale was also high bidder on much of the personal property, including 36 of the 58 cattle auctioned, and certain machinery and household goods. Dale's bids on the personal property auctioned to him aggregated $39,066.50.

Barbara, acting through her brother, bid successfully on household goods totaling $780.

Dale, in payment for the real estate and personal property auctioned to him, gave the receiver a check for $54,666.50 and a note in the same amount. The receiver explained that this sum represented (a) the $39,066.50 owed by Dale for the personal property he bought, and (b) 10 per cent ($15,600) of the price of the real estate. At the time of the hearing on July 27, 1983, the note had not been paid, nor had the receiver "cashed" the check. The receiver did not know whether there were sufficient funds in Dale's bank account to pay the check.

As we understand Dale's testimony, there were two encumbrances on the real estate at the time of the auction. One, described as a "first mortgage," was in favor of The Federal Land Bank of St. Louis; the other, referred to as a "second mortgage," was in favor of the Farmers Home Administration, United States Department of Agriculture. The trial court found that at the time of the hearing on July 27, 1983, the amount owed the Land Bank was $106,245.07, and the amount owed Farmers Home Administration was $72,521.41, making an aggregate secured indebtedness against the real estate of $178,766.48. Those findings are unchallenged.

A Federal Land Bank official testified that said agency had approved a $140,000 loan to Dale to finance his pending purchase of the real estate. That loan, however, would not be made until 30 days after the "final property settlement." The official explained, "[T]here's a standard 30 day waiting period, I believe, for an appeal procedure. It's S.O.P. in our loan procedure to wait that period before dispersing [*sic*] proceeds."

The Land Bank official added that after adjustment for all credits on the existing debt and all charges incident to the new loan, and after application of the net proceeds of the new loan against the existing debt, there would be $44,983.58 left from the proceeds of the new loan.

It is implicit in the official's testimony that the Land Bank expects the new loan to be secured by a first lien on the 600 acre farm. How that is to be accomplished when there is presently a second lien in favor of Farmers Home Administration securing a debt of $72,521.41 is unexplained. Even if one assumes the $44,983.58 flowing from the new Land Bank loan would be applied against the debt to Farmers Home Administration, more than $27,000 would still remain unpaid on that debt. There is no suggestion in the record that Dale has enough cash to pay that balance, nor is there any clue as to how he plans to pay the $15,600 due as his 10 per cent down payment required by the receiver in connection with the auction.

A second tract of real estate, consisting of seven acres, was also sold at the auction. The high bid, $7,600, was made by Paul and Bernice McIntyre. They paid 10 per cent ($760) to the receiver and, according to his testimony, were ready to close the sale immediately. Barbara, however, refused to sign the deed. Consequently, no closing occurred.

With matters in this posture, the trial court entered a decree of dissolution of

marriage on October 7, 1983, almost 5 months after the auction. The decree adjudicated a number of issues, but, except for ordering the parties to perform the agreement filed April 7, 1983, was silent as to both tracts of real estate. Therefore, ownership of those tracts remains as it was prior to the time this action began, subject to whatever may occur in the future as a result of the auction.

■ Section 452.330.1, RSMo 1978, as amended by Laws 1981, p. 615, provides that in a proceeding for dissolution of marriage, the court "shall divide the marital property in such proportions as the court deems just" after considering all relevant factors. Where full disposition of marital property is not accomplished, the trial court has not exhausted its jurisdiction, and no final appealable judgment results. *Hutchins v. Hutchins*, 660 S.W.2d 403, 404[1] (Mo.App.1983). In such circumstances, an appellate court has no jurisdiction of an appeal from such a judgment, and the appeal must be dismissed. *In re Marriage of Dusing*, 654 S.W.2d 938, 944 (Mo.App. 1983).

■ The situation here is analogous to *Ravenscroft v. Ravenscroft*, 585 S.W.2d 270 (Mo.App.1979). There, the parties, who had married in their teens, purchased a home but took title in the names of the husband's parents. The trial court's decree ordered the husband to cause title to the home to be conveyed to the wife, and, if he failed to do so, he was to pay her $10,000. Finding that unacceptable, the Court of Appeals stated: "An essential requirement of a judgment is that it be sufficiently certain in its terms to be susceptible of enforcement in the manner provided by law. To comply with this requirement, the judgment must adjudicate the controversy to a conclusion which permits issuance and processing of an execution without external proof or another hearing." *Id.* at 273[4].

Because future enforcement of the judgment in *Ravenscroft* depended upon subsequent inquiry dehors the record as to whether the husband had caused title to be conveyed and, if not, whether sufficient time had elapsed so that failure to do so obligated him to pay the sum stipulated by the alternative provision, the judgment was not sufficiently definite to be capable of enforcement. *Id.* at 273[5]. Consequently, as the trial court did not fully dispose of the home, it did not exhaust its jurisdiction and no final appealable judgment resulted.

The decree in the instant case is even less definite than the one in *Ravenscroft*, as there is no provision whatever in regard to the 600 acres should Dale be unable to raise the funds to complete the purchase, and there is likewise no disposition of the seven acres should the sale to the McIntyres fail to close.

We therefore hold that the trial court failed to exhaust its jurisdiction in regard to both tracts of real estate, thus there is no final appealable judgment. *Ravenscroft*, 585 S.W.2d 270; *In re Marriage of McSwain*, 601 S.W.2d 656 (Mo.App.1980).

Having reached this conclusion, we need not, and do not, comment on the propriety of the "sale" of either tract.

Regarding the seven acres, the McIntyres are not parties to this suit, and such rights as they may have against Dale and Barbara remain to be determined. Whatever disposition the trial court makes of the seven acres as between Dale and Barbara cannot affect the equities of the McIntyres. All we decide is that in order for the judgment to be final and appealable as to the seven acres, some disposition must be made between Dale and Barbara. What that should be is for the trial court to decide.

The situation regarding the 600 acres is more complex. Dale had nearly 5 months to close that sale during the interval between the auction and the entry of the existing decree, yet he failed to do so. If the trial court nonetheless chooses to continue to treat that sale as valid, and if the

trial court decides to enter the new decree without that sale being closed—a procedure as to which we express no opinion—the decree should at least contain some provision disposing of the 600 acres in the event the sale to Dale is not closed within a specified time after the decree becomes final. Obviously, if the trial court decides that Dale, by reason of his failure to close the purchase of the 600 acres, has forfeited whatever rights he acquired in the auction, if any, the decree will have to make disposition of that property.

We do not imply that the trial court should honor the sale of the 600 acres to Dale, nor do we imply the contrary. As the appeal must be dismissed, we do not reach that issue.

 We do point out that regardless of what the trial court does about the two tracts of real estate, it is essential that the legal descriptions of those tracts be included in the decree. *Fields v. Fields*, 584 S.W.2d 163, 167[11] (Mo.App.1979), *opin. after remand*, 643 S.W.2d 611 (Mo.App. 1982). They do not appear in the existing decree.

As to the personal property, we note that neither Dale nor Barbara has paid for the items they successfully bid at the auction, and there is nothing in the decree indicating that payment was credited by application of their "reasonably anticipated revenues" from the auction. If the trial court opts to treat the "sales" to Dale and Barbara as a valid apportionment of the personal property they bought, the decree should clarify the matter of payment.

The trial court might also consider Barbara's assignments of error regarding certain evidentiary rulings. It may be possible to eliminate those issues from a later appeal, if there be one.

Appeal dismissed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.